UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| DEWAR FRANCISCO BERIGUETE-HERNANDEZ, | ) 2:24-cr-00056-LEW |
| | ) |
| | ) |
| Defendant | |

### ORDER ON DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND MOTION TO SUPPRESS EVIDENCE

Defendant Beriguete-Hernandez was arrested following a series of controlled buys of fentanyl by the Drug Enforcement Agency. He now faces a two-count Indictment (ECF No. 20) charging him with Distribution of Fentanyl and Possession with Intent to Distribute Fentanyl. The Government's case against him is supported by certain statements and evidence taken while Defendant was detained. Before the Court is Defendant's Motion to Suppress Statements (ECF No. 32) and Motion to Suppress Evidence (ECF No. 33). For the following reasons Defendant's Motion to Suppress Statements is granted in part and Defendant's Motion to Suppress Evidence is denied.

### BACKGROUND[1]

When it comes to fentanyl, Maine is a destination state. Fentanyl distributed in Maine most often comes from away, originating in more common distribution hubs like

---

[1] This background is drawn from Defendant's motions, the Government's Response in Opposition (ECF No. 35), Defendant's Reply (ECF No. 41), and a suppression hearing held on June 11.

Boston. Last year, DEA agents in Portland began a series of controlled buys to investigate such a distribution scheme. The investigation used a confidential source ("CS") and an undercover officer ("UC").

CS had two fentanyl suppliers, both of whom worked together. CS knew the suppliers as "My Boy" and "Hook Up." For the first controlled buy, DEA agents had CS arrange for the purchase of $1,000.00 worth of fentanyl. They also instructed CS to introduce UC as a buyer. After some back-and-forth messaging with both My Boy and Hook Up, CS and UC arranged to purchase the fentanyl at a McDonald's in the Kittery Outlets mall. DEA Agents observed the buy from inside and outside the restaurant. A man, later identified as "EP," drove to the buy in a grey Mercedes, met with CS, and sold him or her the agreed-upon amount of fentanyl.

Shortly after the first controlled buy, Hook Up began messaging UC directly. UC arranged to buy $1,400.00 worth of fentanyl. Hook Up directed UC to provide a description of UC's vehicle. On Hook Up's instructions, UC drove to a hotel parking lot. There, he saw the same grey Mercedes from the first buy. Hook Up texted UC to go to the Mercedes, which he did. The driver of the Mercedes was again EP, and EP again provided the fentanyl.

UC and Hook Up continued to text about future purchases and eventually arranged a third buy for $2,000.00 worth of fentanyl. Like the last buy, UC drove to a specific parking lot at Hook Up's request. This time, a red BMW parked next to UC's vehicle. Hook Up messaged UC that he was in the red car and to come alone. A new seller, not EP but an unidentified man, sat in the driver's seat of the red BMW and sold UC the fentanyl.

The fourth controlled buy followed the now established pattern. UC coordinated with Hook Up and travelled to the same McDonald's as the first buy. For this buy, a grey Infiniti sedan parked near UC. After the car parked, UC received an anonymous phone call. A man on the other end of the call asked, "my boy see you, right?" UC went to the Infiniti. Enter Defendant Beriguete-Hernandez. He sat in the driver's seat of the Infiniti, wearing a high-viz orange vest. Defendant completed the sale with UC. As he drove away, the DEA followed his Infiniti back to Massachusetts. The DEA later ran the license plate number of the Infiniti and found it was registered to Defendant with an address in Haverhill.

The fifth and final controlled buy was coordinated in much the same way. Hook Up initially proposed a location in New Hampshire, but on UC's insistence the transaction take place in Maine, with another meeting at the Kittery Outlets mall. UC parked his car there and waited. Hook Up texted "I'm here," but UC responded he didn't see anyone. Hook Up asked for UC's GPS location, which UC shared. Hook Up responded that "he was in a different square that was the problem but give me 2 minutes." About fifteen minutes later the Defendant, now walking, approached UC's car and sprung the DEA's trap.[2]

At least a dozen law enforcement officers lay in wait. None of them saw Defendant drive to the buy. Instead, they saw Defendant, again wearing a high-viz vest, walk toward UC's car. All of the officers were armed, and at least one had an assault rifle. As Defendant attempted to open the passenger door, officers and vehicles surrounded him. Special Agent

---

[2] The facts of Defendant's detention are drawn from body worn camera footage from two of the arresting officers. Def.'s Ex. 1-2 (ECF Nos. 42-1, 42-3).

Scott Rochefort tackled Defendant and handcuffed him. Agent Rochefort then pulled Defendant to his feet. With an assault rifle pointed at him, Defendant was asked, in English, if he had any weapons. Defendant replied, "Yeah, I got," and trailed off. Agent Rochefort repeated the question multiple times. Def.'s Ex. 2 at 0:30-0:39. Defendant eventually answered, "I don't speak English," to which Agent Rochefort responded "OK" and continued to ask about weapons in English. *Id.* at 0:40-45. Deputy U.S. Marshal Cody Forbes approached and attempted to ask the question in Spanish. *Id.* at 0:45. Agent Rochefort cut Forbes off and stated, "He speaks English." *Id.* at 0:47. Defendant responded, "A little bit." *Id.* at 0:48. When Agent Rochefort asked him to clarify, Defendant stated, "I need a translator." *Id.* at 0:49-0:52. Nonetheless, Agent Rochefort again asked Defendant, in English, if he had any weapons, to which Defendant again responded, "Yeah, I got," before trailing off.

Agent Rochefort then frisked Defendant—patting him down, searching his pockets, and rummaging around Defendant's waistline inside his sweatpants and shorts. From Defendant's pockets, Agent Rochefort pulled a bag of fentanyl, an iPhone, and a set of car keys. Not finding any weapons, Agent Rochefort turned to the Defendant and commented, "When I first asked you if you had any weapons on you, you said yes." Defendant responded, "I didn't understand." At this point, Agent Rochefort asked Marshal Forbes to translate the question to Spanish. With the conversation now in his native language, Defendant denied having any weapons.

Another law enforcement officer asked Marshal Forbes to ask Defendant about his car. In Spanish, the Defendant recounted that his car was a Ford Fusion, and gestured in

the direction from where he had approached the UC's car. Task Force Officer Daniel Donovan began searching for Defendant's car in that direction, taking Defendant's seized key fob with him. Officer Donovan testified that he drove and walked around the parking lot pressing the lock and alarm buttons on the key fob. Officer Donovan testified that when he took the key fob, he was also aware he was looking for the Ford that Defendant described to Marshal Forbes.[3] Knowing what a Ford Fusion looks like and having the key fob, Officer Donovan quickly located the Ford Fusion about 100 yards from the UC's car, in a lot on the other side of the outlets. Agents searched the vehicle and found multiple license plates, a social security card, and several of the Defendant's identification cards.

Meanwhile, local police took Defendant to the Kittery Police Department in a marked car. Once there, Kittery Police uncuffed and transferred Defendant to Special Agent Austin Armstrong, Group Supervisor Kate Barnard, and Marshal Forbes. About 30 minutes after Defendant's initial detention, Agent Armstrong began his questioning. First, Agent Armstrong asked Defendant what his name was and to write it down. Defendant answered "Dewar Beriguete." Second, Agent Armstrong asked Defendant where he was coming from. Defendant answered "Haverhill" and went on to say he did not speak English very well. Deputy Marshal Forbes then took over in Spanish, asking the same questions as Agent Armstrong. Defendant repeated, in Spanish, his name and that he had come from Haverhill. Marshal Forbes then read Defendant—for the first time—his *Miranda* rights.

---

[3] At the suppression hearing, Officer Donovan stated he could not currently remember whether he had been informed to look for a Fusion or Focus.

Defendant immediately requested an attorney and the questioning ended. Special Agents Rochefort and Armstrong then arrested the Defendant.

## DISCUSSION

A.  **DEFENDANT'S STATEMENTS**

Defendant's Motion to Suppress (ECF No. 32) seeks to suppress the statements he made when questioned in the Kittery Police Department. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. am. V. A portion of the right against self-incrimination is reflected in a Defendant's so-called *Miranda* rights: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).[4]

*Miranda* rights are ensured by requiring that a Defendant subject to custodial interrogation is warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Id.* As the words suggests, a "custodial interrogation" occurs when a defendant is "both 'in custody' and subjected to 'interrogation.'" *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008). The test is objective: if a reasonable person would understand that the situation amounts to "a formal arrest," then he is in custody. *United States v.*

---

[4] The parties agree that the Defendant was in custody for the purpose of *Miranda*.

*Murdock*, 699 F.3d 655, 669 (1st Cir. 2012) (quoting *United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011)).

Given that the Defendant was tackled, handcuffed, and surrounded by a dozen or so heavily armed officers, it is obvious that he was "in custody" from his initial detention onwards. Although uncuffed later at the Kittery Police Department, his questioning by no less than three law enforcement officers strikes me as the paradigmatic station house interrogation. *See Miranda*, 384 U.S. at 461 ("[T]he compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery."); *New York v. Quarles*, 467 U.S. 649, 655 (1984) (finding custodial interrogation occurred where defendant "was surrounded by at least four police officers").

The Government nonetheless argues that although Defendant was in custody he was not subject to an "interrogation." The Supreme Court has defined interrogation to occur where a Defendant in custody is subject to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The Government's position is that the questions "what is your name" and "where are you coming from" qualify as "normally attendant" or "booking" questions that are outside the scope of *Miranda*.

The booking exception to *Miranda* exists because booking questions "rarely elicit an incriminating response." *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989). But there is an exception to the exception. "[T]he booking exception does not apply 'where

7

the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate." *United States v. Sanchez*, 817 F.3d 38, 45 (1st Cir. 2016) (quoting *Doe*, 878 F.2d at 1551). Whether the booking exception applies is objective. *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000). The ultimate question is whether the questioning officer "reasonably expected" his or her question to elicit an incriminating response. The questioning officer's subjective intent is "relevant [but] in no way conclusive." *Sanchez*, 817 F.3d at 45 (citing *Doe*, 878 F.2d at 1551).

This case is close, but I find that Defendant was subject to a custodial interrogation, at least with respect to the question "Where are you coming from?" Defendant's detention resulted from the DEA's investigation into the flow of fentanyl into Maine. From previous controlled buys and the UC's conversations with Hook Up, the DEA had reason to believe the fentanyl was sourced from outside of Maine. With this information, a reasonable officer would understand the question "Where are you coming from?" to seek an inculpatory statement that linked the Defendant to an interstate drug distribution ring. Defendant's questioning thus draws closer to a "guise of booking" line of questioning. *Sanchez*, 817 F.3d at 45.

But just because the Defendant's statement was taken without a *Miranda* warning does not mean suppression is warranted. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *Miranda*, 384 U.S. at 478. Courts assessing the voluntariness of statements ask "whether the will of the defendant has been overborne so that the statement was not his free and voluntary act." *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986). This assessment considers "the

totality of the circumstances, including both the nature of the police activity and the defendant's situation." *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). Some non-exhaustive factors are the length and location of questioning; law enforcement promises or threats; whether a *Miranda* warning was given; who approached whom; and the defendant's age, education, intelligence, mental capacity, and criminal history. *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014).

In the Government's favor, the questioning was short. Defendant was detained about 30 minutes before his questioning, which consisted of four total questions (two questions given in English then repeated in Spanish). Also in its favor is the fact that the Defendant has been arrested before, indicating more familiarity with his *Miranda* rights. *See United States v. Ackies*, No. 16-cr-20, 2017 WL 3184178, at *4 n.12 (D. Me. July 16, 2017). On the other hand, several factors tip in Defendant's favor. He is young—a teenager, though not a minor. As his counsel pointed out, this highlights his youthful lack of judgment in how best to inconspicuously execute an alleged drug deal, the first rule ought to have been to leave his high-visibility safety vest at home rather than wear it to the meet up. The police approached (or rather tackled) the Defendant and briefly held him at gunpoint. Although there may have been some cooling off, as he was later moved to a police station and uncuffed, he always remained escorted by officers. He was not given a

9

*Miranda* warning before questioning. On top of that, when Defendant was finally advised of his *Miranda* rights in Spanish, he immediately invoked them.[5]

On another close call, my ruling is animated by the concerns that inform the *Miranda* rule. *See United States v. Ellison*, 632 F.3d 727, 729 (1st Cir. 2010) ("*Miranda* is to be 'enforced strictly . . . in those types of situations in which the concerns that powered the decision are implicated.'" (omission in original) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1994) (per curiam))). Defendant's statement that he came from Haverhill was taken in violation of his Fifth Amendment right against self-incrimination. His Motion to Suppress is therefore granted with respect to that answer.[6]

**B.    THE VEHICLE SEARCH**

    **1.    Finding The Car**

Task Force Officer Donovan testified that he used a combination of Defendant's statements about his car and the car's key fob to find and access the Ford Fusion for purposes of a search. Defendant argues both that his statements identifying the car were involuntary in violation of his Fifth Amendment rights and that the use of a key fob to locate his car is an unreasonable search in violation of his Fourth Amendment rights. I agree with Defendant that those statements were made involuntarily during a custodial interrogation, and therefore violated his Fifth Amendment rights. However, in this case

---

[5] The Government briefly argues that because Defendant provided his home address for his Financial Affidavit (ECF No. 9) and Pretrial Services Report (ECF No. 14), he cannot say his answer during interrogation was involuntary. I disagree. Providing a general home address is not the same as answering "Where are you coming from?"

[6] Defendant's answering the question "What is your name?" was not likely to be incriminating, and there is, therefore, no basis for suppressing that statement.

the violation of Defendant's right against self-incrimination does not warrant suppression of the evidence seized from a vehicle search.[7]

Although Defendant's statements were involuntary, they were not needed to locate and search the Ford Fusion. The inevitable discovery doctrine applies here. "Evidence that 'would inevitably have been discovered without reference to the police error or misconduct' may be admitted at trial." *United States v. Hughes*, 640 F.3d 428, 440 (1st Cir.2011) (quoting *Nix v. Williams*, 467 U.S. 431, 448 (1984)). The doctrine applies where (1) the alternative, lawful means of discovery are independent and would be necessarily employed, (2) discovery by the alternate means is inevitable, and (3) the application of the doctrine does not run afoul of the Fourth Amendment's deterrent purposes. *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).

Absent Defendant's statements, Officer Donovan would have been left with only the key fob. It clearly would have been employed. Officer Donovan also testified that had he not been aware of Defendant's statements, he still would have found the car. I find this testimony to be credible. The car was in a relatively small lot that was connected to the Kittery Outlets, it was parked where officers had seen Defendant approach from, and it was not very far from where Defendant was detained. Furthermore, from the markings on the key fob alone, Officer Donovan knew he was looking for a Ford. I find it inevitable that Officer Donovan would have found the Ford Fusion and that a Fifth Amendment violation

---

[7] At the suppression hearing, the Government stated it did not intend to admit any of Defendant's statements about the car into evidence. Suppression is warranted, but I take the Government at its word.

was not the sine qua non of its discovery. With the Fifth Amendment challenge resolved, what remains is a Fourth Amendment challenge.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. am. IV. The Government attempts to stop Defendant at the door, arguing that clicking a key fob to locate a car is not a search to begin with, so the Fourth Amendment is not implicated.

There are two ways the Government can conduct a Fourth Amendment search. First, "a search occurs whenever the government intrudes upon any place in which a person has a 'reasonable expectation of privacy.'" *United States v. Bain*, 874 F.3d 1, 12 (1st Cir. 2017) (quoting *United States v. Katz*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). The test is two-fold: (1) has the Defendant shown an actual expectation of privacy and (2) is that expectation objectively reasonable. *Bond v. United* States, 529 U.S. 334, 338 (2000). Alternatively, the Supreme Court has recognized that searches can occur based on common-law trespass: "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1, 5 (internal quotation marks omitted) (quoting *United States v. Jones*, 565 U.S. 400, 404-05 (2012)).

The First Circuit has not yet dealt with locating a car via keys or a fob, though there are some analogous cases. In *United States v. Bain*, police seized a set of keys from Bain in a search incident to arrest. *Bain*, 874 F.3d at 10. They next used the keys to open the front door of Bain's apartment building, then tried the keys on four apartments to locate

12

Bain's unit. *Id.* The First Circuit straightforwardly applied *Jardines* and found that using the key to open Bain's unit was "a physical intrusion into the curtilage to obtain information." *Id.* at 15.

But the First Circuit has not yet held the same for "effects" under the Fourth Amendment. In *United States v. Lyons*, police arrested Lyons and found six keys on his person, two of which were identifiable as padlock keys. 898 F.2d 210, 211-12 (1st Cir. 1990). FBI agents then took the keys to a storage facility, and successfully tested one of them on a locker known to belong to one of Lyons' associates. *Id.* The First Circuit found that "the insertion of the key into the padlock was merely a means of identifying a storage unit to which Lyons had access." *Id.* at 213. Applying *Katz*, the court concluded, "the insertion of the key into the padlock was not a search." *Id.*; *see also United States v. Hawkins*, 139 F.3d 29, 33 n.1 (1st Cir. 1998) (applying same rule to storage locker in defendant's shared basement).

Turning to the instant case, Defendant cannot show a search occurred under *Katz*'s reasonable expectation of privacy test. Defendant argues that because he locked the vehicle and parked away from UC's car, he had an expectation of privacy in the car under *Katz*. But the search[8] for the car is separate from the search of the car. As far as merely finding the car goes, the *Katz* inquiry is focused on whether Defendant had a reasonable expectation of privacy in what car he drove and where it was parked. He did not. Defendant drove on public roads to a public shopping center. It cannot follow that he then expected the car's location or the fact that he drove it to be private. Nor would any such

---

[8] Used here colloquially.

expectation be reasonable.  *Cf.  United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.").

Under *Jardines*, Defendant has a better argument, but I still cannot find that using a key fob to locate a vehicle is a Fourth Amendment search.  True enough, *Lyons* and *Hawkins* came before the Supreme Court elucidated the trespass theory of Fourth Amendment violations.  However, *Bain* did not, and *Bain* left *Lyons* and *Hawkins* untouched on the basis that "[t]he Fourth Amendment protects effects markedly less than it protects houses."  *Bain*, 874 F.3d at 15.  Even more, the *Bain* Court noted that "the use of keys to identify the owners of cars [was] distinguishable" from using keys to identify homes or apartments.[9]  In this instance, the Ford Fusion, an "effect" for Fourth Amendment purposes, is most aptly treated as a mobile storage locker, for which the First Circuit has held that using a key to ascertain access or ownership is not a search.  *Lyons*, 898 F.2d at 212; *Hawkins*, 139 F.3d at 31 n.1; *Bain* 874 F.3d at 15.  Because no Fourth Amendment

---

[9] In support of this statement the First Circuit cited *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1087-88 (9th Cir. 2000).  *Currency* applied the reasonable expectation of privacy test and held that inserting a key into a car door to determine ownership was not a search.  *Id.*  Defendant points to *United States v. Dixon*, a more recent Ninth Circuit case where, under a property and trespass theory, the Ninth Circuit held that "a Fourth Amendment search occurs when an officer physically inserts a key into the lock of a vehicle for the purpose of obtaining information."  984 F.3d 814, 819 (9th Cir. 2020).  The Ninth Circuit went on to state *Currency* was "'clearly irreconcilable' with the Supreme Court's property-based Fourth Amendment jurisprudence."  *Id.*  However, no First Circuit case has held the same.  Considering the still-good precedent of *Lyons*, *Hawkins*, and *Bain*, I do not adopt out-of-circuit authority for my analysis here.

search occurred by using the key fob to locate the car, there is no Fourth Amendment violation.[10]

### 2. Searching The Car

Having found that the discovery of the Ford was not an independent Fourth Amendment violation, what remains is the rather academic exercise of determining whether, once located, police could search the car. Generally, warrantless searches, like the search of the car, are presumptively unreasonable. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). But exceptions exist, such as the well-known vehicle exception expressed in *Carrol v. United States*, 267 U.S. 132, 134-36 (1925). Per this exception, if a vehicle is "parked in a public place, police may search it without a warrant, relying solely on probable cause." *United States v. McCoy*, 977 F.2d 706, 710 (1st Cir. 1992). Probable cause exists where "the totality of the circumstances suggests that 'there is a fair probability that contraband or evidence of a crime will be found in'" the vehicle. *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013) (quoting *United States v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009)). Fair probability is something "less than a more-likely-than not standard." *United States v. Gonzales*, 113 F.4th 140, 148 (1st Cir. 2024) (citing *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir. 1999)). It "demands only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)) (cleaned up).

---

[10] Having found that using the key fob to identify the car was not a Fourth Amendment search, I do not address the Government's arguments that either the good faith exception or vehicle exception apply to locating the car via a key fob.

Probable cause is readily met here. Law enforcement had conducted four previous controlled buys where a courier had shown up in a car. For this buy, they seized a Ford key fob and half of a pound of fentanyl from Defendant's pockets. At this point, a reasonably prudent person could conclude that Defendant came to the deal in a Ford and that the Ford would contain more evidence of a drug-trafficking crime. The search of the Ford was therefore not in violation of the Fourth Amendment.

## CONCLUSION

For the foregoing reasons Defendant's Motion to Suppress Statements (ECF No. 32) is GRANTED IN PART and DENIED IN PART and Defendant's Motion to Suppress Evidence (ECF No. 33) is DENIED.

SO ORDERED.

Dated this 30th day of June, 2025.

/s/ Lance E. Walker
Chief U.S. District Judge